# ROBERT SMILEY *against* ROBERT DIXON, BENJAMIN CARSON and JAMES CARSON.

A. being the owner of a tract of unimproved land, sells one hundred acres to B. and one hundred acres to C.; B. and C. go upon the ground and mark a division line between them; it was afterwards discovered that A. had no title to the land: B. then went upon it, had a survey made of four hundred acres, including the one hundred acres sold to C. and acquired title by actual settlement: *Held,* That there was not such a privity of estate or title between B. and C. as to prevent B. from thus acquiring for himself, a title to the whole of the land.

WRIT of error to the Common Pleas of Clearfield county.

This was an action of ejectment brought by *Robert Carson,* the plaintiff in error, and plaintiff below, against *Robert Dixon, Benjamin Carson* and *James Carson,*

The case was this: *Robert Maxwell* was the agent of *John Mitchell,* with authority to sell certain lands in Clearfield county, and being indebted to *Robert Smiley,* the plaintiff, he agreed to sell to him one hundred acres of the land, in consideration of the debt. About the same time *Maxwell* also agreed to sell the other hundred acres of the same tract to *Benjamin* and *James Carson,* the defendants, at one dollar and fifty cents per acre, out of which was to be deducted a debt due to them also. *Maxwell* afterwards went upon the ground with *Smiley* and the *Carsons* and marked the division line between them. The agreement between them was that *Mitchell* was to make the titles. Soon after this *Smiley* and the *Carsons* discovered that neither *Maxwell* nor *Mitchell* had any title to the land. At this time no possession had been taken of the land by either party. *Smiley* then said that he would go on the land, improve it, and acquire title by improvement, and hold four hundred acres. He did move on it, built a house, cleared land, raised grain, and made a survey to include the land in question; and which is the part which *Maxwell* sold to *Benjamin* and *James Carson.* About two years afterwards *Benjamin* and *James Carson* went upon their hundred acres, put a small house on it, and put *Dixon,* one of the defendants into it, as their tenant. It was also in proof, that before the *Carsons* went on the land, one *Dunlop* had settled upon their hundred acres, and commenced an improvement, and in conversation between *Dunlop* and *Carson,* he told *Dunlop* that he had better not make an improvement, for *Smiley* would take it from him.

The court below was of opinion, and so instructed the jury, that the plaintiff ought not to recover; on the ground, that each had purchased the one half of the same tract of land, each had expended his money, and each had a right to perfect his own title to his respective lot; and that it would be against equity and justice, to permit either to take advantage of the other, inasmuch as they had

(Robert Smiley *v*. Robert Dixon, Benjamin Carson and James Carson.)

purchased from the same source, with a perfect knowledge of each other's rights, and had been equally unfortunate.

The jury found for the defendants, and the plaintiff sued out this writ of error.

*Blanchard*, for the plaintiff in error.

The law as laid down by the court is only applicable to a case where there is a privity of estate or interest or community of title, and such is the case of *Vanhorn* v. *Fonda*, 5 *Johns. Chan.* 407, upon which the opinion of the court below in this case was predicated. In this case there was no privity of estate or community of title. The doctrine, when it does apply, is founded upon a trust, which did not exist between *Smiley* and *Carson*, for their titles were separate and distinct. Cited *Walker* v. *Walker*, 16 *Serg. & Rawle*, 384. *Dorsey* v. *Jackman*, 1 *Serg. & Rawle*, 51.

*Valentine*, for defendants in error.

The conduct of *Smiley* in procuring his title to the prejudice of *Carson*, taken in connection with the relation which existed between them, was a fraud which equity will not sanction. The parties lived together, consulted about their title, talked about their division line, and with a full knowledge of each other's want of title, *Smiley* sneaks off and commences an improvement not only to perfect his own title, but also take from *Carson* his title. The parties had a community of title; for each purchased the same title from the same person. This is an action in which the plaintiff seeks to have the *equitable* powers of the court administered in his behalf, which his conduct does not merit. He cited 4 *Vin. Ab.* 388. 1 *Fond. Eq.* 125. *Dunning* v. *Carothers*, 4 *Yeates*, 17, *M'Pherson* v. *Cunliff*, 11 *Serg. & Rawle*, 427.

The opinion of the court was delivered by

HUSTON, J.—(His honor here stated the case.) The Court of Common Pleas instructed the jury, that as both plaintiff and defendants had purchased from one who had nothing to sell—mere moonshine, and were equally unfortunate, that it was against equity for the plaintiff to claim, and take into his survey, what he knew another had bought, and what was separated by a line which he knew, and which he saw run and marked. That as they both purchased from the same person, the one could not hold the land which was to have been given to the other: and the court relied on the case of *Vanhorn* v. *Fonda*, 5 *Johns. Chan.* 388, and *Ligget* v. *Bechtol*, in this court. If *Maxwell* had title, this would have been right; for neither could obtain fairly from him, what he knew was by agreement to be conveyed to another. But it is admitted that *Maxwell* had not even colour of title; his sale then, and purchase from him is literally nothing, even if there had been proof that his agreement with *Carson* had assumed any definite shape. Chancellor *Kent* decided, that one of two devisees could

(Robert Smiley *v.* Robert Dixon, Benjamin Carson and James Carson.)

not purchase an incumbrance on their joint estate, and use it to sell the land and strip the other of his property: and in *Ligget* v. *Bechtol*, this court decided, that two tenants in common, who had heard of an adverse title, and agreed to join in defending against it, or in purchasing, were bound to deal fairly with each other: and that one of them who purchased the adverse title *for* a small sum, must hold it in trust for the other, upon that other paying his proportion of the purchase money: and the law is clearly as decided in each of those cases, nay, it goes farther; and wherever two have a joint estate, it raises a duty in each to deal fairly with the other; and one who purchases an adverse title, will not be allowed to sweep all from his co-tenant; unless some special circumstances occur in the case. In this case, these men did not purchase jointly, neither had any thing by purchase from *Maxwell;* they were not joint tenants, or tenants in common; and there was no privity between them. The bare fact that each had been cheated, neither gave any right to the other, or deprived him of the full and absolute right to purchase from the real owner, when discovered. The State was the owner; and *Smiley* purchased from the State by his actual settlement.

When a man sells a defective title, and afterwards purchases the real title, this shall be in trust for his vendee, from whom he shall not take away the land which he himself sold. And when one, present at a treaty of sale, advises a person to purchase and that the title is good, he shall not afterwards purchase a good title, and recover the land from one whom he induced to buy and pay his money. *Lane* v. *Reynard*, 2 *Serg. & Rawle*, 65. This does not come within any of those cases; nor, as is believed, within any decided case; nor is it governed by any principle recognized in any court. There was no privity, no confidence between the parties, no concealment by *Smiley*, and nothing done by him to induce *Carson* to purchase, or to confide in their purchase. The land was vacant to be taken by the first occupant; and there existed no obligation of law or tie of conscience, to prevent *Smiley* from taking possession.

It was however said, that *Smiley*, who was unmarried, boarded at *Carson's* during the inception of his improvement, and until his house was fit to reside in. Of itself this would give no right to *Carson*. The proof is that before and during the time of improving, *Smiley* said he would hold four hundred acres by his improvement; and there is another fact which shows that *Carson* knew this, and acquiesced in it, that is, that he told *Dunlop*, who began to improve on the land now in dispute, after *Smiley*, that *Smiley* could hold the land by improvement, and *Dunlop* moved off. This was a material fact, and showed that *Carson* knew his own purchase to be worthless; that he did not claim under it; that he knew how *Smiley* claimed; knew of the extent of his claim, and admitted its validity. Taking this with the other facts in the cause, we are at

(Robert Smiley *v.* Robert Dixon, Benjamin Carson and James Carson.)

a loss to discover any principle of law or equity, which has been violated by *Smiley,* or on which the *Carsons* can rely as a defence. It is not enough to destroy a right, that some men would have scrupled to have acquired it, until they had inquired of another whether he wished to purchase it. For some time after the imposition by *Maxwell* was discovered, the land was open to occupation by the *Carsons,* as well as by *Smiley;* they do not enter, they know *Smiley* is acquiring title; they state to a third person that his title is good. Years afterwards, when 'the general improvement of the country is adding value to lands, they enter under pretence of what is conceded to be no title. This conduct savours more of unfairness than that of *Smiley.*

Judgment reversed, and a *venire facias de novo* awarded.